IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| R.O. Levy and Betty A. Etheredge, | ) | |
| | ) | C/A No. 3:03-3093-MBS |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Lexington County, South Carolina School | ) | |
| District Three Board of Trustees; and | ) | |
| Elton Wilson, in his official capacity | ) | |
| as Chair of the Lexington County | ) | |
| Registration and Election Commission, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Plaintiffs R. O. Levy, Betty A. Etheredge, and Shirley W. Barr[1] filed this action on September 29, 2003, alleging that the at-large method of electing members of the Lexington County School District Three Board of Trustees (the "School Board") has resulted in unlawful racial discrimination in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.  Plaintiffs allege dilution of the minority vote since 1994, when elections for the School Board were changed from annually during the last week of February, to November of even-numbered years to coincide with the general election date.

The parties appeared before the court for a bench trial on December 5, 2005.  At the request of the parties, the trial recessed after two days of testimony.  The trial reconvened on March 8, 2006,

---

[1] Plaintiff Shirley W. Barr was dismissed as a party on September 28, 2004.

and concluded on March 10, 2006.  The court has reviewed the pleadings, testimony, depositions, exhibits, and applicable law.  The court makes the following findings of fact and conclusions of law, and issues the following order.

## I.  <u>FINDINGS OF FACT</u>

1.    School District Three lies primarily within Lexington County, and includes a small portion of Saluda County. Pl. Ex. 1, 4 (Expert Report of John C. Ruoff, March 13, 2004).

2.    In 2000, the total population of School District Three was 12,807.  The black population was comprised of 3,654 persons, or 28.5% of the total population.   In 2000, blacks comprised 25.0% of the voting age population of the school district.  Pl. Ex. 1, 1 (Expert Report of John C. Ruoff, March 13, 2004).

3.    The members of the School Board historically were appointed by the Lexington County Board of Education.  Beginning in 1978, and pursuant to a referendum vote, a seven-member School Board was established, elected at-large in nonpartisan elections held in the last week of February of each year.  Members were elected to four-year, staggered terms (2-2-2-1), as follows: in three of four years, two seats were elected; in the fourth, the remaining seat was elected.  Turnout was an average of 875 votes cast per seat in the contested elections held from 1978 through 1993.  Pl. Ex. 1, 5 (Expert Report of John C. Ruoff, March 13, 2004).

4.    Since 1994, members of the School Board are elected at-large in nonpartisan elections held at the November general election in even number years with staggered terms (4-3), as follows: in presidential years, four seats are elected; in non-presidential even years, three seats are elected.  Since the change in the method of elections in 1994, voter turnout has

2

quadrupled. Pl. Ex. 1, 7, Table 2 (Expert Report of John C. Ruoff, March 13, 2004)(showing turnout in 1993 was 911 voters and turnout in 2002 was 3,572 voters).

5.  Prior to 1994, three black individuals were elected to the School Board: Albert Lester in 1980, Charles Davenport in 1984 and 1992, and Shirley Barr in 1990. After the change in the method of elections in 1994, and prior to the filing of the within action in 2003, no black candidates were elected to the School Board. Davenport and Barr, both of whom were incumbents, were defeated in their first challenges following the change in the method of elections. Pl. Ex. 579, 3 (Supplemental Report of John C. Ruoff, June 24, 2005); Pl. Ex. 581, 9 (Second Supplemental Report of John C. Ruoff, August 16, 2005). The only black candidate to win under the challenged system was Cora Lester in 2004, after the within action was filed.[2]

6.  The court previously has taken judicial notice of voluminous evidence submitted by Plaintiffs with respect to their assertion that the State of South Carolina, including Lexington and Saluda Counties and the Batesburg-Leesville area, has a long history of discrimination against African Americans.[3] Although the more egregious forms of discrimination, such as

---

[2] The record before the court includes information up to and including the 2004 election.

[3] Much of the information provided by Plaintiffs is available on the district court's electronic filing system at Entry 99. Additional information was provided by Plaintiffs as trial exhibits on March 10, 2006. See also Colleton County Council v. McConnell, 201 F. Supp. 2d 618 (D.S.C. 2002) (noting that South Carolina is among those states that "have the worst reputation for historical and ongoing discrimination against blacks"); NAACP v. City of Columbia, 850 F. Supp. 404, 423 (D.S.C. 1993) ("No one can dispute that South Carolina has a history of discrimination in areas such as education, employment, and health care."); Jackson v. Edgefield County, South Carolina School Dist., 650 F. Supp. 1176, 1183 (D.S.C. 1986) ("The post-Civil War history of South Carolina has demonstrated that there were policies of racial discrimination, either officially or tacitly endorsed by the State, against blacks in practically all areas of their common life.").

separate facilities for different races, no longer are practiced, segregation has continued to exist to a great extent with respect to churches, workplaces, businesses, and communities. For example, the town of Ridge Spring in Lexington County had a majority black population, but as of March 1981, no blacks were employed by the police department. Pl. Ex. 406 (The Twin-City News, March 5, 1981). In 1989, the members of the Batesburg-Leesville Business and Professional Women's Club were all white. Pl. Ex. 436 (The Twin-City News, Nov. 9, 1989). In 1990, the members of the Sandy Ridge Fire Department were all white. Pl. Ex. 445 (The Twin-City News, Nov. 22, 1990). In 1991, the officers and board members of the Batesburg-Leesville Chamber of Commerce were all white. Pl. Ex. 449 (The Twin-City News, April 11, 1991). In 2001, the officers of the Batesburg-Leesville Lions Club were all white. Pl. Ex. 531 (The Twin-City News, July 26, 2001). Eastern Star chapters in Batesburg-Leesville are racially segregated. T. Vol. I, 66; T. Vol. I, 130, 142; T. Vol. II, 259. Neighborhoods are racially identifiable: Sand Hills, Henry Koon's Five Points, Ramble Woods, and Leesville Gardens are predominately black neighborhoods. Pl. Ex. 588 (Jerry Koon deposition designation, Depo., 28).

7. The evidence supports a finding that there are lingering socio-economic effects of discrimination. Based on the 2000 census, in School District Three the median income for white households is in the $40,000 to $44,999 range and for black households in the $20,000 to $24,999 range; 26% of black households live below the poverty line, compared to 8% of white households; blacks are four times as likely to be unemployed as whites; 20% of black households lack a vehicle, compared to 3% of white households; 11% of black households lack a telephone, compared to 3% of white households; 43% of black citizens aged 25 or

more have less than a high school diploma, compared to 24% of white citizens; 18% of

blacks aged 25 have some college education, compared to 41% of whites.  Pl. Ex. 1, 13-15

(Ruoff Report, March 13, 2004); Pl. Ex. 570 (census data and tables for Batesburg-Leesville,

Lexington County, and Saluda County); T. Vol. III, 397-99 (John Ruoff).  More blacks than

whites in School District Three are on the free lunch program.[4]  Pl. Ex. 588 (Jerry Koon

deposition excerpts, Depo., 65).

8.     In June 2003, School District Three applied for a grant under Chapter 1 of Public Law 103-

382 to meet the special education needs of educationally deprived children.  Pl. Ex. 573-H.

The purpose of the grant was to fund schoolwide projects.  According to the application,

during school year 2002-2003, 50% of the students were white, 47% were black, and 3%

were Hispanic or other minorities.  Id. at 2.  Black males scored "up to 45% less than their

white counterparts" on the South Carolina Palmetto Achievement Challenge Test ("PACT"),

and "there is a need to improve instruction and enhance student achievement in the areas of

language arts and math for all students but especially for the African-American male

population."  Id. at 4.  In English/Language Arts, 60.4% of African Americans scored below

"basic" on the PACT, compared to 19.1% of whites.  In Mathematics, 60.4% of African

Americans scored below "basic" compared to 20.1% of whites.  Id. at 6.

---

[4] The goal of the National School Lunch Program is to protect the health and well-being of the nation's children by providing nutritious school meals every day. Schools receive Federal funds for each lunch served, provided that the meal meets established nutrition standards. In order to qualify for the program, one must be a resident of South Carolina and a parent or primary caregiver responsible for a child who attends school.  To qualify, one must have an annual household income before taxes not exceeding $25,900 if two people live in the household; $32,560 if three people live in the household; $39,220 if four people live in the household; $45,880 if five people live in the household; $52,540 if six people live in the household, or $59,200 if seven people live in the household.  See South Carolina Benefit Programs at www.govbenefits.gov/govbenefits.

9.     According to William Gummerson, the Superintendent of School District Three, the relationship between socio-economic status and academic achievement is "huge." T. Vol. V, 871. Gummerson testified that poor black achievement on standardized tests is caused by various factors, including a depressed socio-economic status, single parent families, and "[s]ome of it obviously would be attributed to race." T. Vol. V, 899-900. Gummerson also testified that the present depressed socio-economic status of blacks is linked to past racial discrimination. T. Vol. V, 900.

10.    Black voter registration and black turnout to the polls lags behind whites in School District Three. According to Plaintiffs' expert witness, John C. Ruoff, Ph.D., "there is a significant relationship between the socio-economic conditions of groups and their levels of participation in the electoral process," and "lowered voter participation levels are a symptom of the disparities affecting African-Americans." Pl. Ex. 1, 11-3 (Ruoff Report, March 13, 2004); see also T. Vol. III, 355-57.

11.    Blacks comprised 22% of registered voters in 2004, and whites 78%. T. Vol. III, 356 (John Ruoff). As of 2004, black levels of voter registration remained about 10-11% lower than white levels of voter registration as a proportion of the voting age population. Id.

12.    The level of turnout for both blacks and whites has been increasing since the adoption of the existing method of elections in 1994. However, the percentage of black voters comprising the turnout has generally been less. The percentage of turnout of black voters climbed from 15% in 1994 to 22% in 2004, but that percentage is less than it frequently was prior to 1994, particularly when there was a black candidate. Pl. Ex. 1, 7, Table 2 (Ruoff Expert Report, March 13, 2004); Pl. Ex. 579 1, Table Supp. 1 (Ruoff Supplemental Report, June 24, 2005).

In the 1988 election, for example, there was a black candidate, and blacks represented 43% of the turnout. In the 1990 election there was a black candidate, and blacks represented 31% of the turnout.

13. Myrtis Gantt, who is black, ran for the School Board in 1994 and was defeated. She attended school in Batesburg-Leesville from kindergarten through the twelfth grade, and has lived in the community all of her life. She has a Bachelor of Arts and a Masters of Arts in education. She taught in the public schools for most of her adult life, and was named teacher of the year at Batesburg-Leesville Middle School. She had also been elected to the Batesburg-Leesville city council. T. Vol. I, 49-51.

14. Gantt thinks voting in her School Board election was racially polarized and that she was defeated as a result of bloc voting by whites. Gantt testified that she "believe[s] that probably 90 percent or 95 percent or more of the thousand that I did get were the black voters." T. Vol. I, 56-7, 69.

15. Charles Simpkins, who is black, also was defeated in an election for the School Board in 2002. He grew up in Batesburg-Leesville, and graduated from the public schools there. He has a Bachelor of Science degree in business administration. He established his own financial services business in Baltimore, Maryland, and is an ordained minister in the Baptist Church. He returned to Lexington County in 1998, and has worked as a substitute teacher in School District Three. He pastors a church in nearby Aiken, South Carolina. In 2001, he was elected to the Batesburg-Leesville city council. T. Vol. I, 80-3, 86.

16. Simpkins believes voting in School Board elections is racially polarized, and that whites "vote according to people that they can relate to and people who live in their community."

T. Vol. I, 91.  Simpkins testified, "With the at-large system the majority will vote together, and that makes it extremely difficult for a person who is a minority to get elected."  T. Vol. I, 95.

17.    Lona Sligh, who is black, was elected to the Batesburg-Leesville city council twice, but lost in her elections in 1998 and 2000 for the School Board.  T. Vol. I, 144.  She thinks voting in her election was racially polarized, and that whites "don't tend to want black people on that board[.]"  T. Vol. I, 135-36.  She does not think the at-large system provides black voters an equal opportunity to elect candidates of their choice, and would prefer a system of district elections.  T. Vol. I, 136-37.

18.    Cora Lester, who is black, was elected to the School Board in 2004, after this action was filed.  Cora Lester taught school in School District Three from 1961 to 1987.  At the time she was elected, Cora Lester was teaching adult education courses.  T. Vol. V, 843-44. Some members of the School Board, including Benjamin Rikard, Cheryl Burgess, William Berry, Ralph Kennedy, and Jerry Koon, encouraged her to run.  T. Vol. V, 855-56.  Prior to 2004, Cora Lester had never considered running for public office.  T. Vol. V, 854.  According to Joe Lee Barr, Cora Lester had been approached in 1980 to run for the School Board, but she declined because she "wasn't interested in volunteering."  T. Vol. I, 236.

19.    Notably, Cora Lester ran on a campaign where a critical issue was opposition to the within lawsuit.  Cora Lester published a statement in The State newspaper that "the most critical need in our district is that a group is trying to divide our district into single-member districts."  T. Vol. V, 856-57.

20.    Cecil Edmonds attributed Cora Lester's election to "concern about the lawsuit" challenging

the at-large method of elections.  Edmonds testified that, in his opinion, Cora Lester "was sought out by the white community to run."  T. Vol. I, 33-34.  According to Edmonds, Cora Lester told him "that one of the school board members had asked her to run."  T. Vol. I, 44. Edmonds testified that the School Board member was Benjamin Rikard.  T. Vol. I, 45. When asked why Cora Lester was recruited, Edmonds testified that "[f]rom the conversations that I had with her[,] they wanted someone to be elected from the minority community."  T. Vol. I, 36.

21.    Joe Lee Barr, who is black, testified that Cora Lester's election "could be misleading."  He stated:  "[I]t's ironic that she could be elected at this term . . . she's retired for [the] past 20 years.  She's out of touch with the district, with the system, with the children, and all of a sudden she's elected.  I'm a little leery about that.  When we have had candidates, [who] in my opinion are more qualified, that didn't get half as many votes as she got."  T. Vol. I, 211.

## II. <u>CONCLUSIONS OF LAW</u>

1.    Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, prohibits the use of voting practices that are purposefully discriminatory, as well as those that "result" in discrimination. <u>Thornburg v. Gingles</u>, 478 U.S. 30, 35 (1986).

2.    In <u>Gingles</u>, the Court held that, to establish a violation of the "results" standard of Section 2, a plaintiff is required to show that: (1) the minority group is sufficiently large and geographically compact to constitute a majority in one or more single member districts; (2) the minority is politically cohesive, i.e., tends to vote as a bloc; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. 478 U.S. at 50-51.  Once the three <u>Gingles</u> factors are met, the court must consider whether,

under the totality of the circumstances, minorities have been denied equal opportunity to participate in the political process and to elect representatives of their choice.  Abrams v. Johnson, 521 U.S. 74, 91 (1997).

## GINGLES FACTORS

### Geographical Compactness

3.     The court previously has held that Plaintiffs have established the first Gingles factor, i.e., the black population in School District Three is sufficiently large and geographically compact to constitute a majority in one or more single member districts.  See oral ruling September 9, 2004 (Entry 83).

### Political Cohesion

4.     The second Gingles factor, political cohesion, can be established by "showing that a significant number of minority group members usually vote for the same candidates." Gingles, 478 U.S. at 56.  To determine whether the second Gingles factor has been met, the court turns to the expert testimony and expert reports.[5]

5.     Dr. Ruoff estimated in his August 16, 2005 report that in 1994 Gantt received 94% of the

---

[5] To determine whether blacks are politically cohesive and whether the candidates of choice of the black community are usually defeated by white bloc voting, Plaintiffs' expert, Dr. John Ruoff, analyzed elections for the School Board from 1986 to 2002 using three statistical methods of analysis:  homogeneous precinct (HP), ecological regression (ER), and ecological inference (EI). Pl. Ex. 1, 16-9 (Ruoff Report, March 13, 2004).  In a subsequent report, Dr. Ruoff analyzed the 2004 election for the School Board.  Pl. Ex. 579 (Ruoff Supplemental Report, June 24, 2005). Defendants' expert, Dr. David Epstein, analyzed the same data used by Dr. Ruoff, and used the EI method of analysis.  Def. Ex. 1, 7 (Epstein Report, April 22, 2004); Def. Ex. 2, 2 (Epstein Supplemental Report, June 17, 2004); Def. Ex. 3, 2 (Epstein Supplemental Report, June 28, 2005). Both experts in this case agree that ER, EI, and HP are appropriate methods of analysis in measuring the extent of political cohesion and racial bloc voting in vote dilution cases.  Pl. Ex. 1, 16 (Ruoff Report, March 13, 2004); Def. Ex. 1, 3-4 (Epstein Report, April 22, 2004).

10

black vote and Shirley Barr 64%. In the 1996 election Davenport received 84% of the black vote. In the 1998 election, Sligh received 85% of the black vote. In the 2000 election, Sligh received 71% of the black vote, Simpkins 66%, and Cain 50%. In the 2004 election, Cora Lester received 80% of the black vote. Pl. Ex. 581, Attachment JCR Supp. 1 (corr.) Ruoff Second Supplemental Report, August 16, 2005). Each of these candidates is black. The average cohesion for these candidates was 74%. All of the above candidates received substantial support from black voters and, with the sole exception of Cora Lester, were defeated.[6]

6.    The estimates provided by Dr. Epstein are consistent with the cohesion analysis of Dr. Ruoff. According to Dr. Epstein, in 1994 Gantt received 100% of the black vote and Shirley Barr 74%. In the 1996 election Davenport received 92% of the black vote. In the 1998 election, Sligh received 72% of the black vote. In the 2000 election, Sligh received 73% of the black vote, Simpkins 63%, and Cain 56%. In the 2004 election, Cora Lester received 88% of the black vote. Def. Ex. 2, Table 1 (Epstein Supplemental Report, June 17, 2004); Def. Ex. 3, Table 1 (Epstein Supplemental Report, June 28, 2005). The average cohesion for these candidates was 77%.

7.    The court concludes that black voters in Lexington School District Three are politically cohesive, i.e., they tend to vote as a bloc. The 2002 election constitutes an exception, because no candidate received a majority of the minority vote. See Pl. Ex. 581, Attachment

---

[6] Black voters in School District Three had clear preferred candidates in every election except in 2002, when the black vote was spread across so many candidates that none received a majority of black votes.

11

JCR Supp. 1 (corr.) Ruoff Second Supplemental Report, August 16, 2005) (Padgett, 48%;

Berry, 48%; Etheredge 40%; Burgess, 25%; Rikard, 24%; Hendrix, 13%).

<u>Legally Significant White Bloc Voting</u>

8.      In addressing the third <u>Gingles</u> factor, whether the majority votes sufficiently as a bloc to

defeat the minority's preferred candidate, the court initially must define and identify those

individuals who constitute preferred candidates of minority voters in an election.  The court

is guided by <u>Lewis v. Alamance County</u>, 99 F.3d 600 (4th Cir. 1996), regarding the proper

analysis for identifying minority-preferred candidates.  In <u>Alamance</u>, the Court of Appeals

for the Fourth Circuit reiterated that "Section 2 prohibits any election procedure which

operates to deny to minorities an equal opportunity to elect those candidates whom they

prefer, *whether or not those candidates are themselves of the minority race*."  <u>Lewis v.</u>

<u>Alamance County</u>, 99 F.3d 600, 606 (4th Cir. 1996) (emphasis in original).  Although

minority and majority voters often select members of their own race as their preferred

representatives, an assumption that this is always the case is not appropriate.  Rather, it is

"'the *status* of the candidate as the *chosen representative of a particular racial group*, not

the race of the candidate,' which is relevant in determining whether <u>Gingles</u>' third

precondition is satisfied." <u>Id.</u> (quoting <u>Gingles</u>, 478 U.S. at 68).  With these principles in

mind, the court has reviewed the record with respect to each election between 1994 and

2004.

9.      As a general matter, black-preferred candidates are those "who received substantial support

from black voters." <u>Id.</u> at 614.  The "level of support that may properly be deemed

'substantial' will vary, of course, depending on the number of candidates on the ballot and

12

the number of seats to be filled." <u>Id.</u> at 614 n.11.

10.    In multi-seat elections, the court first must determine whether a preferred candidate of minority voters has been successful, and if so, whether the candidate was first choice among the minority voters or whether other candidates were preferred to the successful candidate. Clearly, a minority-preferred candidate is one who receives a majority of the minority vote and is the first choice among minority voters. In addition,

> in multi-seat elections in which voters are permitted to cast as many votes as there are seats, at the very least any candidate who receives a *majority* of the minority vote and who finishes behind a *successful* candidate who was the first choice among the minority voters is automatically to be deemed a black-preferred candidate, just like the successful first choice.

<u>Id.</u> at 614 (emphasis in original).

11.    However, if the top candidate of choice of the minority community is defeated, and if there is a successful candidate who finishes with a majority of the minority vote behind the unsuccessful first choice, a different analysis appertains. In such a case, the court cannot automatically deem the successful candidate to be a minority-preferred candidate. As the Fourth Circuit explained in <u>Alamance</u>,

> [t]he mere election of a candidate who appears to have received votes from more than fifty percent of minority ballots does not count as a minority electoral success, when each ballot may contain votes for more than one candidate. In such a situation, if there were other candidates, preferred by *a significantly higher percentage* of the minority community, who were defeated in the same election, then it cannot be fairly said that the minority community has successfully elected representatives of its choice. *Each such situation must be reviewed individually to determine whether the elected candidates can be fairly considered as representatives of the minority community.* The presumption must be that they cannot if some other candidate has received *significantly more* minority votes.

13

<u>Id.</u> at 612 (quoting <u>Collins v. City of Norfolk</u>, 883 F.2d 1232, 1238 (4th Cir. 1989))

(emphases added in <u>Alamance</u>).

12.    Thus, when the first choice of black voters is defeated, the court must undertake a two-step

inquiry in ascertaining whether a candidate who receives less support from black voters than

an unsuccessful first choice may nevertheless be deemed a minority-preferred candidate in

the multi-seat election:

> First, if the unsuccessful candidate who was the first choice among
> minority voters did not receive a "significantly higher percentage" of
> the minority community's support than did other candidates who also
> received a majority among minority voters, then the latter should also
> be viewed by the district court as minority-preferred candidates.
> Second, if the level of support received by the unsuccessful first-place
> finisher among black voters was "significantly higher" than the
> support given the second- and third-place finishers by those same
> voters, then successful candidates who finished behind the
> unsuccessful first choice are "presumed not to be the minority's
> preferred candidates or representatives of choice." Even so, the
> district court must still review "[e]ach situation . . . individually to
> determine whether the elected candidates can be fairly considered as
> representatives of the minority community."

<u>Alamance</u>, 99 F.3d at 612 (internal citations omitted).

13.    <u>Alamance</u> provides no test for identifying candidates of choice when no candidate who

received votes from a majority of the minority voters was successful.

14.    In reliance on <u>Alamance</u>, Dr. Ruoff adopted the following "two-thirds" rule in defining

minority candidates of choice:

> A candidate of choice is the candidate receiving the highest
> percentage of votes from black voters in a cohesive election.  A
> candidate not the top vote getter may be a candidate of choice where
> the top-vote getter was unsuccessful if that candidate did not receive
> significantly fewer votes from black vote getters, which I have
> throughout this case defined as not less than 2/3rds the proportion that

14

> the top vote-getter received.  The <u>Alamance</u> decision (at 613) distinguishes between successful and unsuccessful top vote getters whether candidates lower in preference for black voters but still receiving votes from a majority of black voters should "<u>automatically</u> be viewed as a black-preferred candidate if they receive significantly less support from black voters than another [candidate]."  Here, every candidate who received a majority of black votes met the two/thirds test for "significantly less support."  I do not believe that a candidate who did not receive votes from a majority of black voters should be considered a candidate of choice where a substantial majority of voters expressed a strong preference for one or more candidates.  If they were a candidate of choice, black voters would have chosen them in the voting booth.

Pl. Ex. 581, 9 (Ruoff Second Supplemental Report, August 16, 2005); T. Vol. III, 376.

15.    Applying his definition in his June 24, 2005 report, Dr. Ruoff identified nine minority-preferred candidates for School Board during the 1994-2004 time period:  Gantt in 1994 with 93% of the black vote; Shirley Barr in 1994 with 80% of the black vote; Asbill in 1994 with 77% of the black vote; Davenport in 1996 with 93% of the black vote; Sligh in 1998 with 85% of the black vote; Sligh in 2000 with 71% of the black vote; Simpkins in 2000 with 66% of the black vote; Cain in 2000 with 50% of the black vote; and Cora Lester in 2004 with 88% of the black vote.  Pl. Ex. 579, Attachment JCR Supp. 1 (Ruoff Supplemental Report, June 24, 2005).  Of this group, Asbill was the sole white candidate.  Lester and Asbill were the sole successful candidates.

16.    In his final August 16, 2005 report, Dr. Ruoff concluded there was a particularly large, overwhelmingly white precinct, Ridge Road, that was an outlier and thus required special treatment in the regression analysis.  At the time of the 2004 election, Ridge Road contained 1,087 voters, only 22 (2%) of whom are black.  Pl. Ex. 581, 7 (Ruoff Second Supplemental Report, August 16, 2005).  As Dr. Ruoff explained:

15

> This problem is caused by the fact that voting in the Ridge Road precinct was different from voting in other precincts in those elections. It is an outlier with extraordinary influence on these election results, causing the estimates to overstate black support and to understate white support for candidates.

Pl. Ex. 581, 1 (Ruoff Second Supplemental Report, August 16, 2005).

Ruoff further noted that "[b]ecause Ridge Road is close to all white, yet has lower roll on[7] for all candidates, its presence in the regression analysis exaggerates the racial polarization in Lexington School District 3 for this candidate of choice." Pl. Ex. 581, 4 (Ruoff Second Supplemental Report, August 16, 2005).

17.    According to Dr. Ruoff, an example of the way in which inclusion of the Ridge Road precinct distorts the regression analysis is evident from the 1996 election involving Kennedy. Including Ridge Road in the analysis results in an estimate that Kennedy received 45% of the black vote. Pl. Ex. 579, Attachment JCR Supp. 1 (Ruoff Supplemental Report, June 24, 2005). Excluding it from the regression analysis results in an estimate that Kennedy received 35% of the black vote. Pl. Ex. 581, Attachment JCR Supp. 1 (corr.) (Ruoff Second Supplemental Report, August 16, 2005). Dr. Ruoff opines that, since the Ridge Road precinct overwhelmingly consists of white voters, including this precinct in the regression analysis overestimates the percent of black votes cast for Kennedy.

18.    According to Dr. Ruoff, the same is true for the 2004 election involving Kennedy, Padgett, and Fox; that is, including Ridge Road in the regression analysis significantly overestimates the percent of black votes cast for these candidates. Including the Ridge Road precinct in the

_____

[7] Dr. Ruoff defines "roll on" as valid votes actually cast in the contest by persons appearing to vote. Pl. Ex. 1, 18 (Ruoff Report, March 13, 2004).

analysis results in estimates that Fox received 47% of the black vote, Kennedy 44%, and

Padgett 35%. Pl. Ex. 579, Attachment JCR Supp. 1 (Ruoff Supplemental Report, June 24,

2005). Excluding the Ridge Road precinct from the regression analysis results in estimates

that Kennedy received 23% of the black vote, Padgett 20%, and Fox 15%. Pl. Ex. 581,

Attachment JCR Supp. 1 (corr.) (Ruoff Second Supplemental Report, August 16, 2005).

19.    As Dr. Ruoff explained:

> This is not merely a function of the voters in Ridge Road precinct casting ballots in ways that affect the outcome of the regression. If that were the case, white proportions would change but not in any significant way the black proportions because there were only 22 nonwhite voters (2%) in Ridge Road at the 2004 General Election out of 1,087 voters in the un-split precinct. Lexington School District 3 encompassed 96% of registered voters in the precinct, including all of the precinct's nonwhite voters, so this is not a problem of a misallocated split of turnout.
>
> Ridge Road is an outlier because voters turning out in Ridge Road cast substantially fewer ballots than did their neighbors in other precincts. . . . [V]oters in Ridge Road in 2004 cast only 2.32 ballots each, compared to an average of 2.81 in the 6 precincts.

Pl. Ex. 581, 7 (Ruoff Second Supplemental Report, August 16, 2005); Pl. Exs. 584, 587; T.

Vol. III, 365-71.

20.    Dr. Ruoff did not eliminate Ridge Road from his final analysis. As he explained:

> Rather than simply discarding votes from the Ridge Road precinct, I added them back into the analysis after separately completing the ecological regression and ecological inference (EI2 model) estimates for the remaining precincts. I estimated the number of black votes and the number of white votes for each candidate by multiplying the ER or EI estimate by the turnout in that precinct and then added the number of votes cast for the candidate in Ridge Road precinct, allocating votes to race of voters in Ridge Road by the method most favorable to the defendants. That is, I assumed that each of the 22 nonwhite voters in 2004 cast all their ballots for the white candidates

17

> and that no nonwhite voters cast any ballots for the black candidates. This means that white voters were considered to have cast all the votes for black candidates Lester and Rowe in Ridge Road and 22 fewer votes than the total of votes cast in the precinct for white candidates.

Pl. Ex. 581, 8 (Ruoff Second Supplemental Report, August 16, 2005); T. Vol. III, 372.

21.  Dr. Ruoff conceded there is no standard approach to how one treats outliers, and that there may be "a variety of techniques of changing weighting, removing outliers[.]"  T. Vol. III, 372.  The method Dr. Ruoff used–removing the Ridge Road precinct from the regression analysis and adding the votes back in so that the Ridge Road precinct is included in the estimates without being included in the regression analysis or ecological inference estimate– was similar to that used by Dr. James W. Loewen in a prior South Carolina redistricting case, Colleton County v. McConnell, 201 F. Supp. 2d 618 (D.S.C. 2002).  The technique was not faulted by the other experts, including Dr. Epstein, who were involved in the Colleton case. T. Vol. III, 373.

22.  Utilizing the revised data in his August 16, 2005 report, Dr. Ruoff concluded there were eight minority-preferred candidates for School Board between 1994 and 2004: Gantt in 1994 with 94% of the black vote; Shirley Barr in 1994 with 64% of the black vote; Davenport in 1996 with 84% of the black vote; Sligh in 1998 with 85% of the black vote; Sligh in 2000 with 71% of the black vote; Simpkins in 2000 with 66% of the black vote; Cain in 2000 with 50% of the black vote; and Cora Lester in 2004 with 80% of the black vote.  Pl. Ex. 581, Attachment JCR Supp. 1 (corr.) (Ruoff Second Supplemental Report, August 16, 2005).  All eight candidates were black and all were defeated except Cora Lester.

23.  The court concludes that Dr. Ruoff's "two-thirds" rule is a useful guide in identifying

18

candidates of choice. However, Dr. Ruoff's analysis fails to take into account the two-step assessment mandated by <u>Alamance</u> when a candidate receives a majority of the minority vote behind an unsuccessful first choice. Moreover, the court finds that the two-thirds rule yields a more generous interpretation of "significantly higher percentage" than is supported by a reading of the <u>Alamance</u> opinion. Thus, the court will review each election in turn under a more complete construction of <u>Alamance</u>.

24.   Dr. Ruoff correctly denominated Gantt and Shirley Barr as minority-preferred candidates in the 1994 election for School Board. Gantt and Shirley Barr were unsuccessful first and second choices of the minority community. Both candidates were defeated. Utilizing Dr. Ruoff's figures, Asbill was successful and finished third behind these candidates with either 77% of the black vote (June 24, 2005 report) or 49% of the black vote (August 16, 2005 report). Because Dr. Ruoff's figures are estimates, the court finds that it is appropriate to deem Asbill as a successful candidate receiving a majority of the minority vote even using the August 16, 2005 figure.

25.   The next question is whether Gantt, the unsuccessful first choice of the minority voters, received a "significantly higher percentage" of the minority vote than did Asbill, a successful candidate who received a majority of the minority votes. Even using Dr. Ruoff's less disparate June 24, 2005 figures showing Gantt receiving 93% of the vote and Asbill 77% of the vote, Asbill received 16% less support from the minority community than did Gantt. In <u>Collins v. City of Norfolk</u>, 883 F.2d 1232, 1238 (4th Cir. 1989), the Fourth Circuit held that an unsuccessful candidate with 73.4% of the minority vote received a "significantly higher percentage" of votes than successful candidates with 58.2% and 56.5% of the minority

19

vote.  The difference in votes between the unsuccessful candidate and the successful candidates was 15.2% and 16.9%, respectively.  Utilizing Dr. Ruoff's figures, the court concludes that Gantt received a "significantly higher percentage" of the black vote than did Asbill.  Accordingly, Asbill would be presumed not to be the minority's preferred candidate of choice.[8]  The record is neutral with respect to the presumption that Asbill should or should not be characterized as a representative of the minority community, so that the court is unable to make an individualized assessment as to this prong of the test.  However, the potential that Asbill's support is overstated in the June 24, 2005 because of the Ridge Road precinct militates against according Asbill status as a chosen representative of minority voters in the 1994 School Board election.

26.    With respect to the 1996 election to School Board, Dr. Ruoff's June 24, 2005 report showed Davenport with 93% of the vote and Antley with 53% of the vote.  The revised August 16, 2005 report, which treated the Ridge Road precinct differently, attributed to Davenport 84% of the vote and to Antley 35% of the vote.  Antley was successful and placed second behind Davenport, who was defeated.  The court concludes that regardless of the data relied upon, Davenport received a "significantly higher percentage" of the black vote than did Antley (40% higher pursuant to the June 24, 2005 figures, and 49% higher pursuant to the August 16, 2005 figures).  Antley therefore would be presumed not to be a minority-preferred candidate.  The court discerns no evidence in the record to rebut this presumption.

27.    With respect to Sligh (1998), Sligh (2000), Simpkins (2000), and Cain (2000), each

---

[8] Using Dr. Ruoff's August 16, 2005 data yields a "significantly higher percentage" of 45%, with Gantt receiving 94% of the minority vote and Asbill 49%.

candidate was unsuccessful. No other candidate running for School Board in these years received a majority of the minority vote. The court concludes that, utilizing Dr. Ruoff's figures, each of these candidates would be characterized as a minority-preferred candidate.

28.    As noted hereinabove, no candidates of choice are identifiable in the 2002 election because no candidate in the six-candidate field received a majority of the minority vote. The figures are identical in Dr. Ruoff's June 24, 2005 report and his August 16, 2005 report: Padgett (48%), Berry (48%), Etheredge (40%), Burgess (25%), Rikard (24%), Hendrix (13%).

29.    Utilizing the data in either Dr. Ruoff's June 24, 2005 report or his August 16, 2005 report, it appears that black voters in School District Three have elected one candidate between 1994 and 2004 who was their first choice among all the candidates for School Board: Cora Lester in 2004. The next question is whether any candidate in 2004 received a majority of the minority vote behind this successful candidate, so as "automatically to be deemed" a candidate of choice. Regardless of whether the Ridge Road precinct is included, no other candidate received a majority of the minority vote. This does not end the inquiry, however. Under <u>Alamance</u>, "candidates who receive less than 50% of the minority vote [behind a successful first choice of black voters], but who would have been elected had the election been held only among black voters, are presumed also to be minority-preferred candidates, although an individualized assessment should be made in order to confirm that such a candidate may appropriately be so considered." 99 F.3d at 614.

30.    Three seats were to be filled during the 2004 election. In his June 24, 2005 report, Dr. Ruoff ranked Fox (47%) and Kennedy (44%) as finishing second and third behind Cora Lester (88%) in 2004. In his August 16, 2005 report, Dr. Ruoff ranked Rowe (44%) and Kennedy

(23%) as finishing second and third behind Cora Lester (80%).  Fox and Kennedy are white and were successful.  Rowe is black and was defeated.  Utilizing the June 24, 2005 report, Fox and Kennedy hypothetically could have been elected to the School Board had the election been held only among black voters.  Utilizing the August 16, 2005 report, Rowe and Kennedy hypothetically could have been elected to the School Board had the election been held only among black voters.  The court is mindful, however, that it cannot "unquestioningly denominate as black-preferred the top two or three vote-recipients among the black community."  <u>Alamance</u>, 99 F.3d at 614.  The court therefore turns to an individualized assessment of Rowe, Fox, and Kennedy.

31.     As an initial matter, the court finds that the fact that none of these candidates garnered a majority of the minority vote militates against finding that the candidate appropriately should be characterized as a minority-preferred candidate.  As Dr. Ruoff opined, if a candidate were a minority-preferred candidate, he or she most likely would have received a majority of the minority vote.

32.     Rowe did not testify at trial.  Berry testified that Rowe had not had a lot of involvement in the community.  T. Vol. IV, 717.  Kennedy testified that Rowe lived on the outskirts of the community and was not well-known.  <u>Id.</u> at 771.  Notably, Plaintiffs did not identify Rowe as a minority-preferred candidate.  The court concludes that, using Dr. Ruoff's August 16, 2005 figures, Rowe would not be deemed a minority-preferred candidate.[9]

---

[9] Even if the court were to denominate Rowe as a minority-preferred candidate, such a conclusion would support Plaintiffs' case, since Rowe was defeated, while the third-place candidate, Kennedy, was successful.

33.    Fox was born and raised in the Batesburg-Leesville area.  T. Vol. IV, 641. He attended all twelve grades in public school and experienced mandatory desegregation in eleventh grade. Id. at 643.  He received an award as a senior for promoting racial harmony.  Id. at 644.  Fox testified that he knew of no strife between the races.  Id. at 647.  Fox also testified that prior to his deposition he was not familiar with the term "racial segregation." Id. at 665.  Fox further testified that he was not aware of whether the payment of a poll tax was ever a requirement for voting in South Carolina, whether blacks ever were excluded from Democratic primaries or denied the right to vote, and whether blacks ever were excluded from serving on juries.  Id. at 667-68.  Fox also believes that the black community in Lexington County does not suffer in any way from the effects of past discrimination.  Id. at 672.  During his first campaign for School Board in 2000, Fox finished behind Sligh, Simpkins, and Cain with only 22% of the vote.  The court cannot say that this candidate could fairly be considered a chosen representative of the minority community using Dr. Ruoff's June 24, 2005 figures.  See Alamance, 99 F.3d at 612 (quoting Collins, 883 F.2d at 1238).  The court declines to recognize Fox as a candidate of choice of minority voters.

34.    Kennedy first ran for School Board in 1996.  According to Dr. Ruoff's June 24, 2005 report, Kennedy placed fourth among black voters in the 1996 election behind Davenport, Antley, and McCleskey with 45% of the vote. According to Dr. Ruoff's August 16, 2005 report, Kennedy finished third among black voters behind Davenport and Antley, with 35% of the vote.  In 2000, Kennedy placed fourth among black voters behind Sligh, Simpkins, and Cain.  In 2004, Kennedy received approximately the same level of support from the minority community as did Fox: 44% according to Dr. Ruoff's June 24, 2005 report and 23%

23

according to Dr. Ruoff's August 16, 2005 report. The court concludes that Kennedy should

not be a minority-preferred candidate utilizing either Dr. Ruoff's June 24, 2005 report or his

August 16, 2005 report.

35.     Defendants assert that eight candidates of choice have been elected since 1994: Asbill

(1994), Antley (1996), Kennedy (1996), Kennedy (2000), Berry (2002), Cora Lester (2004),

Fox (2004), and Kennedy (2004). Defendants contend that these results demonstrate that

43% of purported candidates of choice of the black community were elected to the School

Board between 1994 and 2004. The court is not persuaded.

36.     Dr. Epstein changed his definition of candidate of choice significantly during the course of

the litigation. In his earliest reports, Dr. Epstein utilized for purposes of analysis Dr. Ruoff's

"two-thirds" rule.

> There is no one accepted definition of candidate of choice of the
> minority community. . . . Nor can a candidate of choice be excluded
> in multi-seat races simply because another candidate received more
> votes from minority voters. In particular, candidates who finish lower
> than first in minority voters' ranking can still be CoC's if the votes
> received by the first-place finisher are not "significantly higher" than
> the votes for a given candidate. Dr. Ruoff's definition (Expert Report
> of John C. Ruoff, p. 22) of a CoC as any candidate with "at least two-
> thirds the proportion of the votes of those turning out of the most
> preferred candidate of voters of that race" is consistent with all these
> requirements, and I adopt it here solely for the purposes of my present
> analysis.

Def. Ex. 2, 3-4 (Epstein Supplemental Report, June 17, 2004).

37.     Later in the litigation, Dr. Epstein changed his definition of candidate of choice to include

those candidates who simply were the highest vote getters among black voters. Def. Ex. 3,

4 (Epstein Supplemental Report, June 28, 2005) ("the four candidates who received the most

votes from blacks would be considered candidates of choice"); Def. Ex. 92, 12 (Epstein Report, October 5, 2005) ("the three candidates who receive the highest level of support from black voters would be presumptively classified as candidates of choice"); T. Vol. IV, 602 ("[I]f there are four elected, and number four, you know, got two percent, if they would have been elected had only black voters voted, according to [Alamance] they are presumptively a candidate of choice.  And under [Alamance] you should entail further analysis.").  The court finds Dr. Epstein's definition of "candidate of choice" to be simplistic and contrary to the meaningful appraisal a court must conduct in making the determination whether a minority community has been successful in electing a representative of its choice.

38.     Utilizing Dr. Epstein's data, Defendants assert that the candidates of choice in 1994 were Gantt with 100% of the black vote and Asbill with 89% of the black vote.  Dr. Epstein's figures place Shirley Barr in third place with 74% of the black vote.   Gantt was defeated.  Asbill finished behind an unsuccessful first choice and received a majority of the minority vote.   The question becomes, then, whether Gantt received a "significantly higher percentage" of the minority vote than did Asbill.  The court cannot say, using Dr. Epstein's figures, that Gantt received a "significantly higher percentage" (11%) of the black vote than Asbill.  Thus, Asbill would be presumed to be a minority-preferred candidate under the scenario offered by Defendants.  Other than competing data from Plaintiffs' expert, Dr. Ruoff, the court discerns no evidence in the record to rebut this presumption.  See Alamance, 99 F.3d at 612.

39.     Utilizing Dr. Epstein's data, Defendants contend that in 1996 the minority-preferred candidates were Davenport with 92% of the black vote; Antley with 59% of the black vote,

and Kennedy and McClesky, each with 53% of the black vote. Davenport, who is black, was unsuccessful. The court finds that, using these figures, Davenport received a "significantly higher percentage" of votes than did Antley (33% greater) or Kennedy and McClesky (39% greater). Antley, Kennedy, and McClesky thus are presumed not to be minority-preferred candidates. See Alamance, 99 F.3d at 612. Given the dramatic disparity in support between the first choice of the black community and the second, third, and fourth place successful candidates, the court concludes that only Davenport qualifies as a candidate of choice of the minority community in the 1996 election, pursuant to Dr. Epstein's figures.

40.     Dr. Epstein's data for the 1998 election identify only one candidate of choice, Sligh with 72% of the minority vote. The identification of Sligh as a minority-preferred candidate is consistent with Dr. Ruoff's data, which recognized Sligh as the sole candidate of choice in 1998 with 85% of the minority vote. In addition, for the 2000 election Dr. Epstein identified as candidates of choice Sligh with 73% of the minority vote, Simpkins with 63% of the minority vote, and Cain with 56% of the minority vote. These figures are consistent with Dr. Ruoff's data, which identify candidates of choice for 2000 as Sligh with 71% of the minority vote, Simpkins with 66% of the minority vote, and Cain with 50% of the minority vote. Each of these candidates is deemed to be a candidate of choice.

41.     Further utilizing Dr. Epstein's data, Defendants identify three candidates of choice for the 2002 election: Padgett with 45% of the black vote, Berry with 44% of the black vote, and Etheredge with 37% of the black vote. However, as discussed hereinabove, the black community demonstrated a lack of cohesiveness during the 2002 election. It is not possible to identify a minority-preferred candidate because no candidate received a majority of the

black vote.  The court declines to consider Padgett, Berry, or Etheredge as candidates of choice.

42.    Finally, Defendants assert, based on Dr. Epstein's data, that Cora Lester with 88% of the minority vote, Fox with 52% of the minority vote, and Kennedy with 49% of the minority vote comprised candidates of choice in the 2004 election.  Each of these candidates was successful.  Fox would automatically be deemed to be a minority-preferred candidate because, according to Dr. Epstein's data, Fox received a majority of the minority vote behind a successful first choice.  See Alamance, 99 F.3d at 614.  Kennedy would be presumed to be a minority-preferred candidate, even though he did not receive a majority of the minority vote, because, utilizing Dr. Epstein's data, Kennedy would have been elected had the election been held only among black voters.  See id.  However, the court previously has undertaken an individualized assessment of Kennedy.  The court determines that Kennedy should not be characterized as a candidate of choice of black voters in School District Three, utilizing Dr. Epstein's figures.

43.    Thus, utilizing Dr. Epstein's data, the court has identified the following minority-preferred candidates: Gantt (1994), Asbill (1994), Davenport (1996), Sligh (1998), Sligh (2000), Simpkins (2000), Cain (2000), Lester (2004), and Fox (2004).  Of these individuals, Asbill, Lester, and Fox were elected.  Only Lester was a first choice of the minority community.

44.    The court finds more reliable Dr. Ruoff's use of three statistical methods of analysis– homogeneous precinct (HP), ecological regression (ER), and ecological inference (EI)–as compared to Dr. Epstein's analysis utilizing only the EI method of analysis.  The court also finds persuasive Dr. Ruoff's explanations regarding the Ridge Road precinct.  The court

adopts Dr. Ruoff's statistical analysis.

45.    The court has applied Dr. Ruoff's statistics in accordance with its construction of the various Alamance tests, and concludes that the following eight individuals should be characterized as minority-preferred candidates for School Board between 1994 and 2004: Gantt (1994), Shirley Barr (1994), Davenport (1996), Sligh (1998), Sligh (2000), Simpkins (2000), Cain (2000), and Cora Lester (2004).  Of these candidates, only Cora Lester (2004) has been elected to the School Board.

46.    Having identified candidates of choice of the minority community, the court turns to the question of whether minority-preferred candidates are defeated by white bloc voting.  The evidence supports a finding that black candidates received relatively little support from white voters in these elections.  In the 1994 election for three seats, Shirley Barr was the fourth choice of white voters, and Gantt the fifth.  In the 1996 election for four seats, Davenport was the sixth choice of white voters.  In the 1998 election for three seats, Sligh was the tenth choice of white voters.  In the 2000 election for four seats, Cain was the eighth, Simpkins the ninth, and Sligh the seventh choice of white voters.  In the 2004 election for four seats, Cora Lester was the fifth choice of white voters in a six candidate field and would not have won if the election had been held only among white voters.  Pl. Ex. 581, Attachment JCR Supp. 1 (corr.) (Ruoff Second Supplemental Report, August 16, 2005).  The average vote by whites for the black candidates who were candidates of choice of black voters was 20%.

47.    The above rankings are identical to those in Dr. Ruoff's June 24, 2005 report.  Pl. Ex. 579, Attachment JCR Supp. 1 (Ruoff Supplemental Report, June 24, 2005).   The average vote

by whites for the black candidates who were candidates of choice of black voters was 19%.[10]

48.   The extent of white bloc voting is further evident from the fact that no black candidate has ever been a candidate of choice of white voters.  Cora Lester received more white votes than any black candidate under the challenged system, but only 38% of white voters actually cast one of their four ballots for her.  Pl. Ex. 581, Attachment JCR Supp. 1 (corr.) (Ruoff Second Supplemental Report, August 16, 2005).  See also, Pl. Ex. 579, Attachment JCR Supp. 1 (Ruoff Supplemental Report, June 24, 2005) (estimating that Cora Lester received 34% of white votes).

49.   As to Cora Lester's successful candidacy, "Gingles . . . cautions against finding a lack of racially polarized voting where the success of a minority candidate can be attributed to special circumstances."  Collins, 883 F.2d at 1232 (citing Gingles, 478 U.S. at 57).  In this case, there is evidence in the record to support a finding that Cora Lester's election was "'motivated by different considerations–namely that election of a black candidate will thwart successful changes to electoral schemes on dilution grounds.'"  Id. (quoting Zimmer v. McKeithen, 485 F.2d 1297, 1307 (5th Cir. 1973)).

50.   The court's conclusion would not be different had it utilized Dr. Epstein's data. The fact that blacks may "also support white candidates acceptable to the majority does not negate instances in which white votes defeat a black preference."  Collins v. City of Norfolk, 883

---

[10] The data provided by Dr. Epstein show virtually identical levels of white support for candidates of choice of black voters.  Def. Ex. 2, Table 1 (Epstein Supplemental Report, June 17, 2004); Def. Ex. 3, Table 1 (Epstein Supplemental Report, June 28, 2005); see also Attachment A (Lexington County School District Three Racial Bloc Voting Estimates).  The average vote by whites for the black candidates of choice of black voters was 19%.

F.2d 1232, 1240 (4th Cir. 1989) (quoting <u>Citizens for a Better Gretna v. City of Gretna</u>, 834

F.2d 496, 502 (5th Cir. 1987)); <u>see also</u> <u>United States v. City of Euclid</u>, 580 F. Supp. 2d 584,

597 (N.D. Ohio 2008) (noting that "the Voting Rights Act's guarantee of equal opportunity

is not met when '[c]andidates favored by blacks can win, but only if the candidates are

white.'") (quoting <u>Rural W. Tenn. African-Am. Affairs Council v. Sundquist</u>, 209 F.3d 835,

840 (6th Cir. 2000)).

51.     The court concludes that the white majority votes sufficiently as a bloc to enable it to usually

defeat the minority's preferred candidates.  The third <u>Gingles</u> factor has been met.

### SENATE REPORT FACTORS

52.     Once the three <u>Gingles</u> factors are met, the court must consider whether, under the totality

of the circumstances, minorities have been denied equal opportunity to participate in the

political process and to elect representatives of their choice.  <u>Abrams v. Johnson</u>, 521 U.S.

74, 91 (1997).  Relevant to the totality of the circumstances analysis are:  first, the extent of

any history of official discrimination in the state or political subdivision that touched the

right of members of the minority group to register, to vote, or otherwise to participate in the

democratic process; second, the extent to which voting in the elections of the state or

political subdivision is racially polarized; third, the extent to which the state or political

subdivision has used unusually large election districts, majority vote requirements, anti-

single shot provisions, or other voting practices or procedures that may enhance the

opportunity for discrimination against the minority group; fourth, if there is a candidate

slating process, whether the members of the minority group have been denied access to that

process; fifth, the  extent to which the members of the minority group in the state or political

subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; sixth, whether political campaigns have been characterized by overt or subtle racial appeals; seventh, the extent to which members of the minority group have been elected to public office in the jurisdiction; eighth, whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and ninth, whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice, or procedure is tenuous.  NAACP v. City of Columbia, 850 F. Supp. 404, 409 (D.S.C. 1993) (citing Senate Report No. 97-417 (1982)); see also Johnson v. De Grandy, 512 U.S. 997, 1018 (1994)(holding that the ultimate determination of a Section 2 violation is to "be assessed 'based on the totality of circumstances'").  It is not necessary that any particular number of factors be proved, or that a majority of them point one way or the other.  See Senate Report No. 97-417 ("Senate Report").  The Senate factors "are supportive of, but not essential to, a minority voter's claim."  Gingles, 478 U.S. at 48 n.15.

First and Fifth Senate Report Factors:<br>Extent of Any History of Official Discrimination; Lingering Effects of<br>Discrimination

53.    The facts generally set forth in the "Findings of Fact" hereinabove establish the existence of the first and fifth Senate Report factors.  The court concludes that the remaining most relevant factors to the within action are the second (the extent to which voting is racially polarized), the third (voting practices or procedures that may have discriminatory effects), and the eighth (the extent to which elected officials have not responded to the particular

31

needs of the minority group).

Second Senate Report Factor:  Racially Polarized Voting

54.    Racially polarized voting means that the race of the voter correlates with the selection of a certain candidate or candidates.  Gingles, 478 U.S. at 62.  That is, voting is racially polarized when "black voters and white voters vote differently."  NAACP v. City of Columbia, 850 F. Supp. 404, 413 (D.S.C. 1993)(quoting Gingles, 478 U.S. at 54 n. 21).  Even Dr. Epstein conceded during trial the existence of racially polarized voting in School District Three:

> A:  If you – to say polarization, whether or not there is different voting patterns, that is almost universal phenomenon, that blacks and whites cast their ballots for different candidates.  As to whether there is a specific number that's a threshold difference, I don't have a particular number.

T. Vol. IV, 569.

55.    Lay testimony also may be relevant to establish the existence of racially polarized voting. See Gingles, 478 U.S. at 41, 52.  As recited in Paragraphs 13 through 17 of the "Findings of Fact," the court heard credible testimony from lay witnesses that voting in School District Three is polarized along racial lines. The statistics supporting white bloc voting also are material to a showing of racially polarized voting.  The court concludes that voting is racially polarized in School District Three within the meaning of the Senate Report factors.

56.    Regarding voting practices or procedures that may have a discriminatory effect, the Supreme Court has held that a Section 2 violation occurs when "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Gingles, 478 U.S. at 47.  The at-large voting system for School District Three has such an

effect.  At-large elections make it more difficult for the minority community, because of the community's relative lack of financial resources, to sponsor and elect black candidates of choice to the School Board, or for minority candidates, because of the candidates' relative lack of financial resources, to campaign successfully.  See, e.g., Rogers v. Lodge, 458 U.S. 613, 627 (1982) ("the sheer geographic size of the county . . . tends to impair the access of blacks to the political process"); Goosby v. Town Board of Town of Hempstead, N.Y., 180 F.3d 476, 494 (2d Cir. 1999) ("[c]ampaign financing is especially difficult in such a large district for black candidates, who have been able to campaign more effectively in smaller districts").  The court concludes that the voting practice or procedure of having at-large elections has a discriminatory effect within the meaning of the Senate Report factors.

### Eighth Senate Report Factor: Extent to Which Elected Officials Have Not Responded to Needs of the Minority Group

57.    The eighth factor regards the extent to which elected officials have not responded to the particular needs of the minority group.  The facts set forth in Paragraphs 8 through 10 of the "Findings of Fact" demonstrate particularized needs possessed by black students in School District Three, as evidenced by the statistical disparities in their educational performance. Further, Fox testified that in English Language Arts 39.5% of blacks performed below basic level as compared to 14.9% of whites.  T. Vol. IV, 676.  On the High School Assessment Program (HSAP) tenth grade exit exam, 28.6% of blacks performed below basic level in English language arts as compared to 6.3% of whites.  Id. at 677-78.  On the mathematics section of the same test, 30.4% of blacks tested below basic level as compared to 10.4% of whites.  Id.  As for recipients of the Legislative Incentive for Future Excellence (LIFE)

scholarships, Fox testified that 22.6% of whites received LIFE scholarships as opposed to 11.6% of blacks, a significant disparity. Id. at 679. Fox testified that he could not account for the disparities. Id. at 678. Surprisingly, in the face of these data Fox testified that the needs of the black community were "[n]o different than any other needs of any other community, to my knowledge." Id. at 680.

58.    Superintendent Gummerson's testimony reveals that School District Three has been slow in hiring qualified black teachers and administrators who may be better equipped to identify and address the particularized needs of the black students in the district. For example, at the time of trial, black teachers comprised only 6% of the teachers in the school system. T. Vol. V, 895. There were four principals, all of whom are white. Id. There were four white assistant principals and one black assistant principal. Id. at 895-96.

59.    Gummerson was queried by Plaintiffs' counsel during trial regarding a Southern Association of Colleges and Schools (SACS) accreditation report. He testified:

> Q.    Would you look at the latter column as it deals with deficiencies? Isn't one of them that the students don't think they are treated equally?
>
> A.    I believe it says [students believe they] are not treated fairly by their teachers.
>
> Q.    And then there is also a comment from the teachers that says they don't think the students are treated equally?
>
>        . . . .
>
> Q.    Do you know what was meant by those findings of deficiencies?
>
> A.    Well, the first one, I would think that is, discussions I've had with teachers, is that both students, black and white, there is a sense

that some teachers do not – that some teachers are not relational. That would apply to both black and white. Then the second one, I would think in a small town there is always the perception that some people would say depending on who you are you get better or worse treatment.

T. Vol. V, 903-04.

60.  Gummerson's testimony suggests a lack of responsiveness to the needs of those black students who are performing poorly. Another conclusion that can be inferred from Gummerson's testimony is that black students may perceive that they are being treated differently and that perhaps the vast majority of their teachers either do not or are not able to relate to them or respond to their particularized needs.

61.  The testimony of the School Board members in general reflected views inconsistent with facts in the record with respect to the lingering effects of discrimination in School District Three. For example, Fox opined that he believed the black community in Lexington County did not suffer in any way from the effects of past discrimination. T. Vol. VI, 672. Berry similarly testified that he believed that blacks do not suffer any present day effects from past discrimination. T. Vol. IV, 734. Kennedy testified that "there probably are some continuing effects" of discrimination against blacks in Lexington County. T. Vol. IV, 795. The court concludes that the eighth Senate Report factor has been satisfied.

### ORDER

62.  The Gingles factors having been met and it appearing that, under the totality of the circumstances, black voters in School District Three have been denied equal opportunity to elect School Board members of their choice, the court further concludes that at-large elections for the School Board of Lexington County School District Three dilute minority

35

voting strength in violation of Section 2 of the Voting Rights Act. The parties are directed to submit proposed remedial plans to cure the violation within sixty days of the date of entry of this order.

**IT IS SO ORDERED**.

/s/ Margaret B. Seymour
United States District Judge

Columbia, South Carolina

February 19, 2009.